IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NOS.  1:CR-03-087-01** |
|  | : | **1:CR-03-087-02** |
|  | : | **1:CR-03-087-03** |
| **v.** | : | **1:CR-03-087-04** |
|  | : |  |
| **GARY L. SWEITZER** | : |  |
| **LOUIS FIERRO** | : |  |
| **BRIAN HOCH** | : |  |
| **MICHAEL SEDOR** | : |  |

**M E M O R A N D U M**

Before the court is Defendant Sweitzer's objections to the

Government's calculation of the amount of fraud-related loss in this case.[1]  The

parties have briefed the issues, and the court held a hearing on October 18, 2004.

The matter is now ripe for disposition.

I.        **Background**

The defendants in this case pleaded guilty to conspiring to defraud the

United States by impeding the lawful functions of the U.S. Department of Housing

and Urban Development ("HUD") in connection with the federal single-family

---

[1]Although Mr. Sweitzer's counsel provided most of the argument regarding the issues presented herein, the court must make a determination on the amount of loss for all of the defendants.  Because all of the defendants with the exception of Defendant Fierro are similarly situated, the court's rulings on Mr. Sweitzer's objections to the Government's calculation of loss will apply with equal force to Defendants Hoch and Sedor. Mr. Fierro, however, was not involved with some of the alleged loss; thus, the court will specify how his calculation of loss differs from the other defendants.  The court also notes that Defendant Fierro filed his own memoranda on the loss issues in this case.  Where his arguments diverge from Mr. Sweitzer's, the court will address those arguments accordingly.

mortgage insurance program operated by HUD through the Federal Housing
Administration ("FHA").  Defendants' conspiracy involved the sale of duplex homes
in a development marketed toward first-time homebuyers.  The development was
called the Barwood Estates ("Barwood") and was located in York County,
Pennsylvania.

Mr. Sweitzer, the owner of Barwood, advertised that homes in Barwood
could be bought with no money down through FHA-insured mortgages.  Under HUD
regulations, a homebuyer is required to provide at least a 3% minimum investment to
qualify for an FHA-insured mortgage.  The homebuyer, however, is permitted to
secure the funds for the minimum investment from sources other than its own
monies, such as a gift from a family member or by earning "sweat equity" by
performing work on the house.  (Tr. of Oct. 18, 2004 Hr'g at 94 *ll*.13-20.)

One mechanism through which a homebuyer may obtain the minimum
investment is the use of a grant company.  (*Id*. at 57 *ll*.1-5.)  A grant company is a
non-profit organization that issues funds to a homebuyer to assist in settlement costs.
(*Id*. at 55 *ll*.14-17.)  The seller, however, may reimburse the grant company for the
funds it provided to the homebuyer.  (*Id*. at 97 *ll*.8-20.)  Under these circumstances,
the seller would also be required to pay a fee to the grant company.  (*Id*. at 56 *ll*.19-
21.)  The seller, though, is prohibited from providing funds directly to the seller.  (*Id*.
at 72 *ll*.7-17.)

In order to avoid paying the fee to grant companies, Mr. Sweitzer
elected not to use these companies as a means to complete sales transactions of
some Barwood homes.  (Def. Sweitzer's Mem. Concerning Oct. 18, 2004 Loss Hr'g
at 6.)  Instead, Mr. Sweitzer gave financial assistance directly to homebuyers, but

covered his actions by falsely reporting that the funds came from a gift or earned sweat equity. (*Id.* at 5.) In other words, Mr. Sweitzer, through his own conduct and the involvement of the other defendants, participated in mortgage settlements where the minimum investment was procured through false gifts and unearned sweat equity.[2] (*Id.*)

At the October 18, 2004 hearing, Ines Norwood, a special agent for the HUD Office of Inspector General, testified as to the following, which forms the basis of the Government's calculation of fraud-related loss caused by Defendants. From 1998 to late 2001, approximately 165 homes were sold at Barwood. (Tr. of Oct. 18, 2004 Hr'g at 10 *ll.*13-16.) Of those 165 homes, 157 had loans that were guaranteed by HUD. (*Id.* at 10 *ll.*17-19.) Approximately 112 of the 157 HUD-guaranteed loans included fraudulent reports of gifts or earned sweat equity, and 88 of those loans actually resulted in losses to HUD or the lender involved in the transaction. (*Id.* at 10 *ll.*23-25 to 11 *ll.*1-14.) The losses from these 88 loans forms the universe of alleged loss in this case. (*Id.* at 11 *ll.*10-19.) Special Agent Norwood summarized her findings of loss in a spreadsheet marked as Government's Exhibit 1 that was divided into three categories. The first two categories deal with loans that were issued by MNC Bank ("MNC"), a lender that originated many of the loans at Barwood.[3] The third category includes loans that originated from other lenders.

---

[2]Mr. Hoch was the sales manager at Barwood. Mr. Sedor was the attorney who acted as the primary settlement agent for sales of property at Barwood. Mr. Fierro was a loan officer for MNC.

[3]MNC is also known as, and has been referred to by the parties as, First Horizon. Because MNC was the entity involved at the time of the wrongdoing, the court will use "MNC" to refer to MNC and First Horizon interchangeably.

### A.  Category 1: 54 Loans Modified by MNC

In late 2001, representatives from MNC contacted Special Agent Norwood about irregularities in some of its Barwood loans.  (*Id*. at 7 *ll*.3-7.)  MNC noticed that appraisals performed on foreclosed homes indicated that the value of those homes was significantly lower than the loan amount.  (*Id*. at 110 *ll*.1-14.)  HUD officials then met with Dean McGee, a vice-president for asset recovery at MNC, to discuss ways to remedy the situation.  (*Id*. at 7 *ll*.10-22.)  Following an investigation that revealed Defendants' fraudulent activity, HUD and MNC entered into a settlement agreement.  (*Id*. at 15 *ll*.17-20.)  Under the terms of the agreement, MNC was required to, among other things, "obtain new appraisals, buy down the mortgages for the overvalued amounts, and complete streamline refinances at no cost to the borrowers" for the 54 loans that are included in Category 1.  (Gov't Ex. 2 at 4.)  The 54 modified loans encompassed loans that were current as well as loans in default that were deemed to be salvageable.  (Tr. of Oct. 18, 2004 Hr'g at 78 *ll*.17-25 to 79 *ll*.1-13.)  The total amount of MNC's alleged loss related to these loans is $1,334,150.46, which reflects the costs of modifying the loans.  (Gov't Ex. 1 at 4.)

### B.  Category 2: 24 Loans Indemnified by MNC

This category includes 24 loans on Barwood properties that were foreclosed upon and sold at a loss.  (Tr. of Oct. 18, 2004 Hr'g at 13 *ll*.19-23.)  Because HUD had already issued its guarantee on these defaulted loans, MNC agreed, according to the terms of the settlement agreement, to indemnify HUD for the out-of-pocket and future losses sustained on these properties.  (*Id*. at 76 *ll*.7-14.)  Many of the losses incurred from these foreclosed properties were offset in part by re-sale of the home.  (*Id*.)  In the end, with the exception of one property, HUD was

made completely whole for its losses on these loans as a result of the settlement agreement.  (*Id*. at 22 *ll*.7-12.)  The property that HUD has not been indemnified for was owned by the Black family.  (*Id*.)  MNC sold the loan on this home to Chase Manhattan, and HUD paid out a claim to Chase Manhattan when the loan defaulted. (*Id*.)  MNC will reimburse HUD for this loan, but because the property has not yet been re-sold, Special Agent Norwood estimated that MNC's loss will be $54,000. (Tr. of Oct. 18, 2004 Hr'g at 17 *ll*.11-25.)  With the inclusion of the estimated loss on the Black property, together with the losses incurred from indemnifying HUD, MNC has allegedly sustained a total loss of $1,224,786.79 on these 24 loans.[4] (Gov't Ex. 1 at 7.)

### C.    Category 3: Losses to HUD on 10 Non-MNC Loans[5]

The third category consists of 10 non-MNC loans that went through the process of foreclosure.  (Tr. of Oct. 18, 2004 Hr'g at 19 *ll*.6-11.)  HUD insured the lenders for these loans, and after re-selling some of the properties, HUD has currently sustained an out-of-pocket loss of $413,440.92.  (*Id*. at 19 *ll*.19-25 to 20 *ll*.1-11.) Three of these properties, however, have not yet re-sold.  (*Id*. at 20 *ll*.12-15.) Special Agent Norwood estimated that HUD's losses on these properties will be approximately $177,000.  (*Id*.)  Thus, HUD's total alleged loss on the 10 loans is $590,440.82.  (*See* Gov't Ex. 1 at 7-8.)

---

[4]The Government mistakenly calculated the total for this category as $1,170,786.79.  This figure does not include the $54,000 of estimated loss for the Black property.  The Government clearly intended to include this figure so the court will add it to the calculation.  (*See* Gov't's Resp. to Post-Hr'g Mem. at 7 n.7.)

[5]This amount of loss is not attributable to Mr. Fierro because he was only involved with MNC-related loans.

In sum, the grand total of alleged loss in this case is $3,149,378.07. This figure is derived from the sum of the three categories: $1,334,150.46 (Category 1) + $1,224,786.79 (Category 2) + $590,440.82 (Category 3) = $3,149,378.07.[6]

## II.        Legal Standard: Calculation of Loss

When the calculation of loss in this case was initially set to be determined by the court, the United States Sentencing Guidelines ("the Guidelines") laid out the legal standard to be utilized. Shortly before the court was scheduled to hear the parties' loss arguments, however, the Supreme Court issued its decision in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). In *Blakely*, the Supreme Court held that a Washington state sentencing scheme offended the Sixth Amendment because it deprived the defendant of his constitutional right to a jury determination. *Id*. at 2538. In so deciding, the Supreme Court ruled that

> the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of facts reflected in the jury verdict or admitted by the defendant*. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may

---

[6]In the alternative, the Government argues that a proper measure of the amount of loss is the face value of the 112 HUD-insured loans that contained false reports of gifts or earned sweat equity. The value of these loans is approximately $12 million. (Tr. of Oct. 18, 2004 Hr'g at 11 *ll*.4-6.) The Government contends that this figure is a reasonable estimate of the loss because it is "the amount of money diverted to ineligible program beneficiaries." (Gov't's Resp. to Post-Hr'g Mem. at 5.) The court rejects this figure as the amount of fraud-related loss because it is not the actual loss caused by Defendants. The Government was able to offset some of its losses by re-selling some of the properties, and these amounts should be included in the calculation. To the extent the Government contends this amount is Defendants' intended loss, this argument must also fail. To determine intended loss, the court must look at what the defendant sought to gain from committing the crime. *United States v. Feldman*, 338 F.3d 212, 223 (3d Cir. 2003). The defendants in the captioned matter sought to circumvent the grant company fee requirements. The court does not believe that they intended the loss to be the full value of all 112 loans. In any event, it is the Government's burden to prove intended loss. *Id*. at 216. The Government does not articulate a clear argument on this issue; thus, the court need not address whether an intended loss occurred in this case.

> impose after finding additional facts, but the maximum he
> may impose *without* any additional findings.

*Id*. at 2537 (internal citations omitted).  Although the Supreme Court offered no opinion as to whether its ruling extended to the Guidelines, *id*. at 2538 n.9, this court concluded that the principles in *Blakely* necessarily applied to the instant case and rendered the Guidelines, as applied to Defendants' proceedings, unconstitutional. Thus, the court concluded that it would employ a discretionary sentencing scheme, but rely on the Guidelines "as providing useful instruction on the appropriate sentence."  *United States v. Croxford*, 324 F. Supp. 2d 1230, 1248 (D. Utah 2004). With this framework in place, the court held a hearing on the amount of loss on October 18, 2004.

On January 12, 2005, the Supreme Court rendered an opinion in *United States v. Booker*, 125 S. Ct. 738 (2005), which addressed the effect of *Blakely* on the Guidelines.  In *Booker*, the Supreme Court held that *Blakely* applied to the Guidelines and that the Guidelines violated the Sixth Amendment because they required judges to find facts that enhanced a defendant's sentence beyond what could be imposed based solely on the jury's verdict or facts admitted by the defendant.  *Id*. at 746.  To remedy the constitutional defect in the Guidelines, a different majority of the Court severed the two provisions of the Sentencing Reform Act that made the Guidelines mandatory.[7]  *Id*. at 756-57.  This modification rendered the Guidelines "effectively advisory" and allowed sentencing judges "to tailor the sentence in light of other

---

[7]The two provisions severed were 18 U.S.C. § 3553(b)(1) (Supp. 2004), which makes the Guidelines mandatory, and 18 U.S.C. § 3742(e), which relies on the mandatory nature of the Guidelines. *Booker*, 125 S. Ct. at 756-57.

statutory concerns as well, see [18 U.S.C.] § 3553(a)."[8]  *Id*. at 757, 764-65.  The Court, however, noted that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  *Id*. at 767.[9]

Following the Supreme Court's decision in *Blakely*, the lower courts have wrestled with the issue of what weight the Guidelines should be given. *Compare United States v. Wilson*, 350 F. Supp. 2d 910, 912 (D. Utah 2005) (concluding that the Guidelines should be given "heavy weight" and should be departed from only "in unusual cases for clearly identified and persuasive reasons"), *with United States v. Ranum*, 353 F. Supp. 2d 984, 987 (E.D. Wisc. 2005) (rejecting the *Wilson* court's "heavy weight" analysis and finding that while the Guidelines should be given serious consideration in all cases, "courts should not follow the old 'departure' methodology").  Despite these varying opinions, one thing is for certain: The court "must consult [the] Guidelines and take them into account when sentencing."  *Booker*, 125 S. Ct. at 767; *see also United States v. Crosby*, 397 F.3d 103, 111 (2d Cir. 2005) (concluding that after *Booker*, "sentencing judges remain under a duty with respect to the Guidelines–not the previously imposed duty to apply the Guidelines, but the continuing duty to 'consider' them, along with the other factors listed in section 3553(a)").  Thus, for purposes of the instant matter, the court will initially rely on the Guidelines and caselaw interpreting the Guidelines to make a

---

[8]Section 3553(a) directs a sentencing court to consider, among other things, the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1)–(a)(2).

[9]The Supreme Court also adopted a new standard of review for appellate courts. *Booker*, 125 S. Ct. at 765.  Following *Booker*, appellate courts are to review sentences imposed by district courts for reasonableness. *Id*.

calculation of loss.[10]  The court will then use this figure to determine Defendants'

sentence under the Guidelines.  *See Crosby*, 397 F.3d at 111 ("In order to fulfill [its]

statutory duty to 'consider' the Guidelines, a sentencing judge will normally have to

determine the applicable Guidelines range.").  Once a Guidelines sentence has been

determined, the court will consider whether other relevant factors under 18 U.S.C. §

3553(a) warrant the imposition of a non-Guidelines sentence.

The calculation of loss under the Guidelines is governed in large part by

the Application Notes to § 2F1.1.  Under these provisions, "loss" is "the value of the

money, property, or services unlawfully taken."  U.S. Sentencing Guidelines Manual

§ 2F1.1, app. n.8 (2000).[11]  In making this determination, the calculation of fraud-

related loss

> need not be determined with precision.  The court need
> only make a reasonable estimate of the loss, given the
> available information.  This estimate, for example, may be
> based on the approximate number of victims and an
> estimate of the average loss to each victim, or on more
> general factors, such as the nature and duration of the fraud
> and the revenues generated from similar operations.  The
> offender's gain from committing the fraud is an alternative
> estimate that ordinarily will underestimate the loss.

---

[10]The Government argues that the effect of the court's ruling regarding *Blakely* is that "Guideline constructs and Guideline caselaw are now inapplicable to the calculation of loss in this case." (Gov't Resp. to Post-Hr'g Mem. at 2.)  Instead, the Government would have the court rely on the standard set forth in *United States v. Baylin*, 696 F.2d 1030 (3d Cir. 1982), which, the Government asserts, was the standard for reliability of sentencing evidence in pre-Guidelines cases.  In *Baylin*, the Third Circuit held that "as a matter of due process, factual matters may be considered as a basis for sentence only if they have some minimal indicium of reliability beyond mere allegation."  *Id*. at 1040.  Given the Supreme Court's holding in *Booker*, however, the Government's arguments that *Baylin* controls are moot.

[11]The court will rely on the 2000 edition of the Guidelines because of an ex post facto consideration raised from using subsequent versions.  *See* U.S. Sentencing Guidelines Manual § 1B1.11 (b)(1). The court also notes that the 2000 edition was used to prepare Defendants' Pre-Sentence Reports.

*Id.* § 2F1.1, app. n.9.  Additionally, loss related to fraud is generally measured by the amount of money the victim has actually lost as of the time of sentencing, not the potential loss as estimated at the time of the crime.  *United States v. Brennan*, 326 F.3d 176, 195 (3d Cir. 2003); *United States v. Kopp*, 951 F.2d 521, 536 (3d Cir. 1991), *superseded in part by statute on other grounds as recognized by United States v. Corrado*, 53 F.3d 620, 624 (3d Cir. 1995).  In determining actual loss in fraudulent loan application cases, the loss is "reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan."[12]  U.S. Sentencing Guidelines Manual § 2F1.1, app. n.8(b).  In any event, the actual loss must reflect "the harm *caused* by the defendant's crime." *United States v. Feldman*, 338 F.3d 212, 220 (3d Cir. 2003) (emphasis added). Nevertheless, "the 'loss' should be revised upward to the loss that the defendant intended to inflict, if that amount is higher than the actual loss."  *Kopp*, 951 F.2d at 536; *see also* U.S. Sentencing Guidelines Manual § 2F1.1, app. n.8.

The burden of proving the amount of loss in this case rests with the Government.  *United States v. Evans*, 155 F.3d 245, 253 (3d Cir. 1998); *United States v. McDowell*, 888 F.2d 285, 291 (3d Cir. 1989) ("[W]hen the Government attempts to upwardly adjust the sentence, it must bear the burden of persuasion.").[13] In *Evans*, the Third Circuit explained that the "burden is . . . on the government to prove by a preponderance of the evidence the facts in support of a sentence

---

[12]The Government has approached this case as analogous to a fraudulent loan application case under Application Note 8(b) to § 2F1.1.  (Gov't Resp. to Post-Hr'g Mem. at 5.)

[13]If a defendant seeks a downward departure, he or she would bear the burden of persuasion. *United States v. McDowell*, 888 F.2d 285, 291 (3d Cir. 1989).  The sole issue of this memorandum, however, is the calculation of loss, which would upwardly adjust Defendants' sentences.

enhancement; the defendant does not have to 'prove the negative' to avoid the enhanced sentence." *Evans*, 155 F.3d at 253 (quoting *McDowell*, 888 F.2d at 291). If, however, the Government establishes a prima facie case, the burden of production shifts to the defendant. *Evans*, 155 F.3d at 253. At this point, the defendant is "required to come forward with evidence tending to cast doubt on the government's evidence." *Id*. The ultimate burden of persuasion, though, remains with the Government. *Id*.

The parties disagree as to what the burden of proof is in this case. Mr. Sweitzer asserts that post-*Blakely* and *Booker*, the Government must prove loss beyond a reasonable doubt as opposed to by a preponderance of the evidence. In support of this proposition, Mr. Sweitzer cites *United States v. Huerta-Rodriguez*, 355 F. Supp. 2d 1019 (D. Neb. 2005). In *Huerta-Rodriguez*, the court concluded that "[w]hatever the constitutional limitations on the advisory sentencing scheme [set forth in *Booker*], the court finds that it can never be 'reasonable' to base any significant increase in a defendant's sentence on facts that have not been proved beyond a reasonable doubt." *Id*. at 1028. Ultimately, the *Huerta-Rodriguez* court determined that following the Supreme Court's decision in *Booker*, it would "continue to require that facts that enhance a sentence [be] properly pled in an indictment or information, and either admitted, or submitted to a jury (or to the court if the right to a trial by jury is waived) for determination by proof beyond a reasonable doubt." *Id*. at 1029. In so deciding, the court relied on the doctrine of constitutional avoidance. The court reasoned that "the limits of due process are defined with reference to the line that separates an element of a crime from a sentencing factor" and that because this line was "blurred," it would "adopt

sentencing procedures that lessen the potential that a sentence will later be found unconstitutional." *Id*. at 1028.

Upon review of the principles set forth in *Huerta-Rodriguez*, this court declines to adopt the approach laid out in that opinion. The *Huerta-Rodriguez* court correctly noted that "[t]he Due Process Clause is implicated whenever a judge determines a fact by a standard lower than 'beyond a reasonable doubt' if that factual finding would increase the punishment above the lawful sentence that could have been imposed absent that fact." *Id*. at 1024; *see also United States v. Booker*, 125 S. Ct. 738, 748 (2005) (" 'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' ") (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). However, post-*Booker*, "the maximum lawful sentence is the statutory maximum sentence." *United States v. Crosby*, 397 F.3d 103, 109 n.6 (2d Cir. 2005).

In *Huerta-Rodriguez*, the district court for the District of Nebraska reasoned that

> [b]ecause a district court's determination can be reviewed for reasonableness, and can accordingly be reversed if found unreasonable, the upper limit of a lawful sentence is no longer the "maximum term of imprisonment" under a statute that sets out a generally broad range (i.e., the "statutory maximum"), but the highest point within that range that is "reasonable." . . .
>
> The fact that this court's discretion is cabined, post-*Booker*, by the requirement of reasonableness means that the court cannot sentence a defendant above a reasonable point within a sentencing range without affording procedural protections under the Fifth and Sixth Amendments.

12

*Huerta-Rodriguez*, 355 F. Supp. 2d at 1024-25.  This court disagrees with the *Huerta-Rodriguez* court's characterization of the "maximum lawful sentence" post-*Booker*.  By excising the Sentencing Reform Act provisions that made the Guidelines mandatory and thus making the Guidelines "effectively advisory," *Booker*, 125 S. Ct. at 757, the *Booker* remedial majority cured the constitutional defects of judicial fact-finding following the Supreme Court's earlier decision in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).  *See Booker*, 125 S. Ct. at 764 ("[W]ithout [18 U.S.C. § 3553(b)(1)]–namely the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges–the statute falls outside the scope of *Apprendi*'s requirement.") (internal quotation and alterations omitted).  In other words, the "*prescribed* statutory maximum" is no longer limited by the now advisory Guidelines.  *Apprendi*, 530 U.S. at 490 (emphasis added).  Instead, the maximum lawful sentence is governed by the statutory maximum.  *See Booker*, 125 S. Ct. at 790 ("[D]istrict courts have discretion to sentence anywhere within the ranges authorized by statute–much as they were generally able to do before the Guidelines came into being.") (Scalia, J., dissenting in part); *see also United States v. Crosby*, 397 F.3d 103, 109 n.6 (2d Cir. 2005) ("As a result of the Remedy Opinion in *Booker/Fanfan*, . . . the maximum lawful sentence is the statutory maximum sentence . . . .").

The *Huerta-Rodriguez* court erred by limiting the maximum lawful sentence to the highest point under the statutory maximum that is reasonable.  The *Booker* remedial majority did not contemplate such a restriction.  The portion of the *Booker* opinion addressing reasonableness was written in the context of establishing an appellate standard of review.  *See Booker*, 125 S. Ct. at 765.  If the Supreme

Court had intended to limit the "prescribed maximum sentence" for *Apprendi* purposes by imposing a reasonableness limitation onto the statutory maximum, this court feels that it would have explicitly stated so.

Because judicial fact-finding under advisory Guidelines does not "increase[] the penalty for a crime beyond the prescribed statutory maximum," *Apprendi*, 530 U.S. at 490, it is unnecessary to submit sentence-enhancing facts to a jury to be proved beyond a reasonable doubt.  *Crosby*, 397 F.3d at 109 n.6.  Thus, this court finds that the procedures espoused by the *Huerta-Rodriguez* court are not warranted.  Instead, this court concludes that the more prudent approach is to follow the established precedent that in most cases, "a defendant's rights in sentencing are met by a preponderance of the evidence standard."  *United States v. McDowell*, 888 F.2d 285, 291 (3d Cir. 1989) (citing *McMillan v. Pennsylvania*, 477 U.S. 79 (1986) for the proposition that there is little doubt "[t]hat the preponderance of evidence standard can withstand constitutional muster"); *cf. United States v. Kikumura*, 918 F.2d 1084, 1101 (3d Cir. 1990) (holding that "a preponderance standard is generally constitutional" under *McMillan*, but that a clear and convincing standard may be warranted in cases where an extreme enhancement is sought).[14]  To find otherwise without an express statement from Congress or a higher appellate authority would run

---

[14]In a recent letter to the court, submitted after the hearing and the end of the briefing schedule, Mr. Sweitzer cites to *Kikumura* as support for his assertion that the Third Circuit has found the preponderance standard inadequate for factual findings in certain situations.  In so arguing, Mr. Sweitzer seems to suggest that the Third Circuit's holding in *Kikumura* supports the use of a beyond a reasonable doubt standard in this case. The court disagrees.  First, under *Kikumura*, a higher standard than preponderance is only warranted when an extreme enhancement is sought.  *See Kikumura*, 918 F.2d at 1100-01.  Second, even if an extreme enhancement is sought, the *Kikumura* court contemplated only a clear and convincing standard.  *Id*. at 1101. Finally, if Mr. Sweitzer wished to rely on *Kikumura*, he should have brought this argument much earlier in these proceedings.  As it is, the court concludes that the argument is waived.

roughshod over one of the central concerns of the *Booker* remedial majority–uniformity in sentencing.[15]  *See Booker*, 125 S. Ct. at 767.

## III.        Discussion

Mr. Sweitzer's objections to the Government's characterization of the loss in this case generally fall into five categories.  First, the Government has not established loss causation; therefore, a finding of zero loss is proper.  Second, the values of the homes at Barwood are in line with the original sale prices charged by Mr. Sweitzer.  Third, the Government has failed to establish a reliable loss amount.  Fourth, the losses incurred by MNC should not be attributed to Mr. Sweitzer for sentencing purposes.  Finally, a proper alternative to the measurement of loss in this case is the gain Mr. Sweitzer obtained by avoiding the grant company fees.  Defendant Fierro, for his part, joins Mr. Sweitzer's arguments, but asserts that his limited involvement in the conspiracy had no influence on the alleged inflated valuation of the Barwood properties that caused so many defaults.  Defendant Fierro also contends that the gain he realized from the commissions he earned on these

---

[15]The court is cognizant of the Third Circuit's recent non-precedential decision in *United States v. King*, No. 03-4715, 2005 WL 851452, at *1 (3d Cir. Apr. 14, 2005), in which the Third Circuit interpreted *Booker* as holding that "any fact not admitted by a defendant or proven beyond a reasonable doubt to the fact finder could not be used to increase a defendant's sentence."  *See also United States v. Spencer*, No. 03-3017, slip op. at 3 (3d Cir. Apr. 19, 2005) (holding in a non-precedential opinion that the district court erred by enhancing the defendant's sentence without submitting the issue to the jury for proof beyond a reasonable doubt or having an admission from the defendant).  The Third Circuit's opinion in *King* does not provide any further discussion on the issue.  Regardless, because the decision is non-precedential and because the *King* opinion would run counter to established Third Circuit precedent, this court will await a definitive statement from the Third Circuit before it employs a standard other than the preponderance of the evidence.  In fact, the Third Circuit recently withdrew and vacated its opinion in *King*.  *See United States v. King*, No. 03-4715 (3d Cir. Apr. 19, 2005).  In short, the Third Circuit has provided little guidance on post-*Booker* issues such as the standard of review, and this court has made every attempt to mesh the principles of *Booker* with established precedent until the waters made muddy by *Booker* start to settle in the Third Circuit.

loans is an appropriate alternative to a measurement of loss.  The court will address each of these arguments below.

### A.      The Government's Alleged Failure to Establish Loss Causation

Mr. Sweitzer argues that the Government has failed to establish loss causation in two ways.  First, the lawful availability of grant companies negates causation because Mr. Sweitzer could have done lawfully everything he did unlawfully.  Second, losses associated with the defaults at Barwood cannot be attributed to Mr. Sweitzer because the actual reasons for default were related to intervening causes.  Mr. Sweitzer contends that either of these theories would require a finding of zero loss.  For the reasons set forth below, the court disagrees.

### 1.      The Lawful Availability of Grant Companies

Mr. Sweitzer argues that the lawful availability of grant companies negates loss causation and requires a finding of zero loss.  In other words, Mr. Sweitzer asserts that he could have done lawfully everything he did unlawfully simply by utilizing grant companies.  In so arguing, Mr. Sweitzer relies on *United States v. Feldman*, 338 F.3d 212, 221 (3d Cir. 2003), in which the Third Circuit concluded that "to determine harm (and thus actual loss), we must compare what actually happened with what would have happened if [the defendant] acted lawfully."

The Government counters Mr. Sweitzer's first "zero loss" argument by asserting that the argument is both legally and factually flawed.  The Government contends that the law regarding fraudulent loan applications does not provide for consideration of what actually happened compared to what would have happened if the defendant had acted lawfully.  Additionally, the Government argues that even if such an analysis were permitted, the facts of this case do not support Mr. Sweitzer's

assertion that he could have lawfully supplied the same funding he provided to Barwood buyers through the use of grant companies.  The court will address each of these arguments in turn.

### a.    <u>The Government's Legal Argument</u>

As stated above, Mr. Sweitzer relies on the Third Circuit's decision in *Feldman* to support his argument.[16]  In *Feldman*, the defendant withheld large amounts of property he owned from a bankruptcy petition.  *Id*. at 214.  The defendant argued that most of the property he withheld from the petition was held by his wife and him as tenants by the entireties, which made the property unavailable to his creditors under bankruptcy laws.  *Id*. at 215.  Thus, although the defendant acknowledged that he committed a crime by failing to report the property, he argued that his crime did not effect the amount of money his creditors would have received if he had acted lawfully.  *Id*.

The district court in *Feldman* calculated the amount of loss for both restitution and sentencing purposes.  *Id*.  The district court determined the actual loss to compute the restitution, but relied on the intended loss to set the sentencing range because it found the intended loss to be greater than the actual loss for sentencing purposes.  *Id*. at 216.  In calculating the actual loss, the district court relied on the difference between what was owed to the defendant's creditors and what they actually received in the bankruptcy discharge.  *Id*.  In so deciding, the district court did not consider whether the property would in fact have been exempt from

---

[16]*Feldman* was also governed by the 2000 version of the Guidelines.  *Feldman*, 338 F.3d at 221 n.4.

bankruptcy because it found that the defendant would have lost the exemption under bankruptcy law by initially concealing the property.  *Id*.

The Third Circuit vacated the district court's calculation of the actual loss, reasoning that the difference between what the creditors were owed and what they were paid did not accurately reflect the harm caused by the defendant's crime. *Id*. at 220.  The Third Circuit concluded that "we do not think that we can apply the reasoning behind denying exemptions for assets concealed in a bankruptcy proceeding to the determination of actual loss for restitution (or sentencing) purposes."  *Id*.  Instead, the Third Circuit emphasized that "to determine harm (and thus actual loss), we must compare what actually happened with what would have happened if [the defendant] had acted lawfully."  *Id*. at 220-21.  In remanding the case to the district court, the Third Circuit admonished the court to

> consider whether [the defendant] would have been entitled to an exemption for property owned by him and his wife as tenants by the entireties if he had acted lawfully and whether the bankruptcy trustee would have recommended discharge, even if the property was exempt from bankruptcy, in light of the large amount of property owned by [the defendant] and his wife.

*Id*. at 221.

The Government seeks to distinguish the reasoning of *Feldman* on the grounds that it is dicta and that it does not represent Third Circuit law on causation in fraudulent loan application cases.[17]  The Government's argument that the relevant

---

[17]The Government also argues that another Third Circuit case, *United States v. Needle*, 72 F.3d 1104 (3d Cir. 1996), opinion amended, 79 F.3d 14 (3d Cir. 1996), is the controlling Guideline case on causation, not *Feldman*.  The court disagrees.  Upon review of the Third Circuit's reasoning in *Needle*, the court does not see how the opinion conflicts with the reasoning in *Feldman*.  The cases appear to address separate issues.  The *Needle* majority dealt with intervening causes while the *Feldman* court set forth the

(continued...)

reasoning of *Feldman* is mere dicta must fail.  Although the Third Circuit's discussion of causation took place in the context of restitution, the court indicated that its reasoning applied with equal weight for sentencing purposes.  *Id*. at 216, 220-21.  Further, the language relied on by Mr. Sweitzer was central to the Third Circuit's holding.  *Id*. at 221.  In fact, the Third Circuit's instructions to the district court on remand included similar reasoning.  *See id.* at 221.

As for the Government's argument that *Feldman* does not represent the applicable law for fraudulent loan application cases, the court concedes that the Government's assertion may have merit.  In support of its argument, the Government relies on *United States v. Abbey*, 288 F.3d 515 (2d Cir. 2002).  In *Abbey*, the Second Circuit concluded that Application Note 8(b) to the U.S. Sentencing Guidelines § 2F1.1 does not permit consideration of what the defendant in a fraudulent loan application case could have done lawfully.[18]  *Id*. at 518.  In so deciding, the Second Circuit rejected the defendant's argument that "the district court's loss determination should have been based on the difference between the total amount of the loan and the portion of the loan that could have been obtained in the absence of any fraud."  *Id*. at 517.  The Second Circuit decided that the plain language of Application Note 8(b) reflected the Sentencing Commission's intent that the actual loss in fraudulent loan application cases be reduced by the amount recovered from the disposition of the collateral.  *Id*. at 518.

---

[17](...continued)
notion that a causation analysis requires a comparison of what actually happened to what would have happened had the defendant acted lawfully.  Regardless, the Third Circuit's decision in *Feldman* was issued after *Needle*, and to the extent the decisions conflict, *Feldman* would control.

[18]The *Abbey* court relied on the 2000 version of the Guidelines.

The court finds the holding in *Abbey* persuasive.  The language in Application Note 8(b) appears to provide a definitive method for calculating actual loss in fraudulent loan application cases.  However, the Third Circuit has not spoken on the issue, and this court need not reach an absolute determination on the matter to resolve the calculation of loss in this case.  Even if Third Circuit law requires the court to consider what actually happened compared to what would have happened if Mr. Sweitzer had acted lawfully in fraudulent loan application cases, the result would not be a finding of zero loss because, as explained below, the factual evidence demonstrates that Mr. Sweitzer could not have completed the Barwood sales legally through the use of grant companies.

### b.   The Government's Factual Argument

As the developer of Barwood, Mr. Sweitzer primarily marketed homes to first-time homebuyers who were eligible for FHA-insured mortgages.  In order to qualify for an FHA-insured mortgage, the homebuyer must provide at least a 3% minimum investment.  The essence of Mr. Sweitzer's crime is that he gave financial assistance directly to homebuyers and concealed his actions by falsely reporting that the funds came from a gift or earned sweat equity.  Mr. Sweitzer argues, however, that because he could have provided financial assistance to the homebuyers through the use of grant companies, the Third Circuit's holding in *Feldman* dictates a finding of zero loss.

The court concedes that grant companies are a lawful conduit through which a seller may provide funds toward an FHA-insured homebuyer's minimum investment.  (Tr. of Oct. 18 Hr'g at 97 *ll*.14-20; Def. Sweitzer's Mem. Concerning Oct. 18, 2004 Loss Hr'g, Ex. H.)  The court, however, is not convinced that, as a

20

factual matter, the Barwood sales in question could have occurred utilizing grant companies instead of false gift letters and unearned sweat equity.  As explained in further detail below, the evidence before the court does not demonstrate that grant companies could have been used in these particular sales.

As a preliminary matter, the parties dispute whose burden it is to prove the factual basis of whether Mr. Sweitzer could have carried out the transactions in question through grant companies.  Mr. Sweitzer contends that the burden is on the Government as part of its burden to prove sentence enhancements and that placing the burden on the defendant for this issue would require the defendant to "prove the negative" to avoid the enhancement.  *See United States v. Evans*, 155 F.3d 245, 253 (3d Cir. 1998).  The Government counters that the burden is Mr. Sweitzer's because the defendant must prove facts that downwardly adjust a sentence.  The Government contends that " '[o]ne who affirmatively seeks special favor at sentencing has the burden of proving why it should be bestowed.' "  *United States v. McDowell*, 888 F.2d 285, 291 (3d Cir. 1989) (quoting *United States v. Garcia*, 544 F.2d 681, 385-86 (3d Cir. 1976)).  The court is not persuaded by either party's argument.

The amount of loss is a sentencing enhancement issue.  *See* U.S. Sentencing Guidelines Manual § 2F1.1(b)(1).  Thus, the burden is on the Government to prove the fraud-related loss by a preponderance of the evidence.  *Evans*, 155 F.3d at 253.  Once the Government has made out a prima facie case, the burden of production shifts to the defendant.  *Id*.  In order to meet this burden, the defendant must produce evidence that "casts doubt" on the Government's evidence.  *Id*.  The ultimate burden of persuasion, however, remains with the Government.  *Id*.

21

In this case, the Government's burden is to prove the actual loss. The Government's assertion is that the actual loss is the amount of the claims paid by HUD minus the amount of the re-sale or re-appraisal of the properties. In an attempt to "cast doubt" on the Government's theory of loss, Mr. Sweitzer has argued that the loss is zero because he could have done lawfully everything that he actually did. The court's determination, then, is whether Mr. Sweitzer has successfully "cast doubt" on the Government's case, keeping in mind that the ultimate burden of persuasion remains on the Government to prove loss. Upon consideration of Mr. Sweitzer's arguments, the court concludes that he has failed to meet his burden of production on this issue.

At the conclusion of the October 18, 2004 hearing, Mr. Sweitzer submitted Defendant Sweitzer's Exhibit 16, which includes the affidavit of Defendant Brian Hoch as well as documentation from various sales at Barwood. Mr. Sweitzer contends that Defendant Sweitzer's Exhibit 16 demonstrates that some Barwood customers, outside of the 88 customers involved in the loans at issue for the instant matter, who used non-MNC lenders were able to obtain settlement assistance from a grant company. Mr. Sweitzer asserts that if these transactions had been completed through MNC, they most likely would have involved a false gift letter or false report of earned sweat equity. In Mr. Sweitzer's view, this evidence proves that the transactions involving fraudulent conduct could have been accomplished through lawful means. The court disagrees.

The fact that buyers who used non-MNC lenders were able to secure assistance from grant companies has no bearing on whether the buyers involved in the actual fraudulent transactions in question could have obtained similar assistance.

22

The Third Circuit's opinion in *Feldman* requires a showing that what *actually happened* could have been done lawfully. *Feldman*, 338 F.3d at 221. Mr. Sweitzer has not broken down a single transaction involved in the conspiracy to demonstrate that the same amount of money he provided directly to a buyer could have been given lawfully through a grant company.[19] Mr. Sweitzer seems to suggest that it is enough to allege that the same losses would have occurred if he had sold the homes at issue to the same buyers through *any* grant company and *any* HUD-approved lender. Missing from Mr. Sweitzer's characterization, though, is evidence that any HUD-approved lender using any grant company would have allowed him to provide the *same* amount of money he actually provided to buyers. In one case, Mr. Sweitzer gifted 14% of the loan amount to a buyer. (*See* Gov't Ex. 1 at 7, The Alice K. Quinn Transaction.) Although Mr. Sweitzer did not provide evidence as to what the ceiling for settlement assistance from grant companies was at the time of the fraud, the court cannot imagine that it could have reached as high as 14%.[20]

---

[19]The Government argues that the evidence shows that Mr. Sweitzer definitely could not have lawfully provided the same amount of money. One of the Government's witnesses at the hearing, Dean McGee, a representative of MNC, testified that MNC only allowed 3% of the purchase price of a home to come through one of the grant companies it used, Nehemiah. Mr. McGee then testified that Mr. Sweitzer generally provided more than 3% to the buyers whose transactions were involved in the conspiracy. (Tr. of Oct. 18, 2004 Hr'g at 160 *ll*.3-22.) Mr. McGee also testified, however, that he did not know if this limitation was in place during the period of the fraud occurring at Barwood. (*Id*. at 161 *ll*.11-14, 162 *ll*.1-10.) Thus, the court finds this testimony unconvincing.

[20]Exhibit D to Mr. Sweitzer's Memorandum Concerning the October 18, 2004 Loss Hearing is a printout of the webpage, getdownpayment.com. This webpage describes the requirements of Nehemiah's grant program. This information provides that as of September 15, 2004, settlement assistance from a grant company could not exceed 6%. Agent Norwood also testified that a seller may provide up to 6% of the total cost of the home through a grant company. (Tr. of Oct. 18, 2004 Hr'g at 24 *l*.25 to 24 *ll*.1-3.) In reviewing Defendant Sweitzer's Exhibit 1 and the Government's Exhibit 1, the court calculated that the average amount Mr. Sweitzer provided directly to the Category 1 buyers was roughly 4.73%. However, the average amount provided to the Category 2 buyers was 6.80%, and of the 8 out of 10 gift amounts included for the Category 3

(continued...)

In short, Mr. Sweitzer's theory does not comply with the Third Circuit's ruling in *Feldman*.  In *Feldman*, the property the defendant withheld from his bankruptcy petition could actually have been unavailable to his creditors had he lawfully disclosed it.  *Feldman*, 338 F.3d at 220-21.  Thus, to say that the creditors were "owed" the value of the property did not reflect the defendant's crime.  *Id*. at 220.  Here, Mr. Sweitzer has not provided any evidence to demonstrate that the particular transactions in question could have been conducted lawfully.  The fact that loans not involving false gift letters or unearned sweat equity were procured through grant companies fails to "cast doubt" on the Government's calculation of the loss.  Therefore, the court rejects Mr. Sweitzer's argument that *Feldman* necessitates a finding of zero loss in this case.

## 2.   Intervening Causes

Mr. Sweitzer next argues that the fraud-related loss in this case is zero because the defaults were caused by intervening events that were outside of Mr. Sweitzer's control.  In support of this argument, Mr. Sweitzer offers Defendant Sweitzer's Exhibit 15, which provides the reasons for default for 20 of the 24 defaulted MNC loans.  Mr. Sweitzer contends that this exhibit demonstrates that the real causes of the defaults were adverse changes in the personal circumstances of the homeowners, such as divorce or unemployment.  Mr. Sweitzer also asserts that MNC initially miscalculated the homebuyers' escrow accounts, which later resulted in higher monthly payments when the amount allotted for escrow was adjusted upward.  In sum, Mr. Sweitzer argues that these circumstances "create[] a powerful inference

---

[20](...continued)
buyers, the average amount was 7.04%.  (*See* Gov't Ex. 1; Def. Sweitzer's Ex. 1.)

that the mechanism by which the borrowers received their settlement funds did not cause any defaults." (Mr. Sweitzer's Post-Hr'g Mem. at 10.) The court is not persuaded.

The Government correctly points out that the Third Circuit's decision in *United States v. Needle*, 72 F.3d 1104 (3d Cir. 1996) forbids such a result. In *Needle*, the defendant started an insurance company in the Virgin Islands, but misrepresented the amount of the company's initial capital. *Id*. at 1106. Not long after the company was established, a hurricane hit the Virgin Islands, and the company was unable to satisfy the claims of its policyholders. *Id*. The defendant argued that the hurricane was an act of nature beyond his control and that the resulting property losses should not be included in the calculation of his sentence. *Id*. at 1109. The Third Circuit rejected this argument, noting that "[the defendant] did not attempt to sell hurricane coverage in Chicago or in Wichita; he sold it in the Caribbean, a hurricane zone." *Id*. at 1110. The Third Circuit also noted that "it is not appropriate to reduce the amount of the loss, as computed under the Guidelines, in order to reflect other causes of the loss which were beyond the defendant's control." *Id*.

The Third Circuit's reasoning in *Needle* applies with equal force to the circumstances of this case. Mr. Sweitzer did not market to experienced and sophisticated homebuyers. Instead, he dealt with low-income, first-time homebuyers who were more susceptible to default. Indeed, one of the central purposes of FHA loans is to help buyers who might not otherwise qualify for conventional loans. Thus, it was foreseeable that these buyers would default if provided inappropriate settlement assistance. Regardless, consideration of other causes is prohibited by the

Third Circuit's ruling in *Needle*.  *See id.*  Thus, the court concludes that the alleged intervening causes do not justify a finding of zero loss.

Even if intervening causes were a valid consideration, the court is at a loss as to how this factor would necessitate a finding of zero loss.  Mr. Sweitzer only produced the "actual" reason for default in 20 of the 24 MNC loans in Category 2. The 54 Category 1 loans never reached foreclosure or were deemed salvageable, and Mr. Sweitzer does not provide the reasons for default of the 10 Category 3 loans. Mr. Sweitzer, however, seems to argue that the inference created by the default reasons of the Category 2 loans can be extended to the other categories.  This inference is too tenuous.  Under any circumstances, Mr. Sweitzer's "intervening causes" theory would not warrant a finding of zero loss.[21]

## B.   **Valuation**

The general theme underlying Mr. Sweitzer's valuation arguments is that the original Barwood sale prices were not overvalued, but in fact reflected the homes' actual value.  Mr. Sweitzer argues that this point impacts loss in two ways.  First, citing to *United States v. Napier*, 273 F.3d 276, 279 (3d Cir. 2001), Mr. Sweitzer contends that he "is entitled to the full value of the property" for the calculation of loss for Categories 2 and 3 as determined by the "most reliable" means available.

---

[21]In *Needle*, the Third Circuit noted that "[a]n intervening force that increases a fraud-related loss will not decrease the loss valuation but will only provide possible grounds for a downward departure."  *Needle*, 72 F.3d at 1110.  Mr. Sweitzer requests such a downward departure in his Post-Hearing Memorandum.  The court, however, does not feel that the alleged intervening causes in this case warrant a downward departure. The court believes that the Government proved that Mr. Sweitzer's conduct, as opposed to intervening circumstances, caused the loss in this case.  Mr. Sweitzer's fraudulent acts put the buyers at greater risk for default.  But for Mr. Sweitzer's fraudulent scheme, some of these homebuyers might not have obtained an FHA-insured loan.  *Cf. id.* (holding that a downward departure was not warranted because but for the defendant's fraud, he would not have been in the insurance business).  As a result, a downward departure is not justified in this case.

Second, Mr. Sweitzer asserts that because the original sales prices reflect the homes'
actual value, MNC's approximately $1.3 million of alleged loss in modifying
downward the mortgage amounts for the 54 Barwood homes listed in Category 1
must be categorically excluded from the loss calculation.  The court will address each
of these arguments below.

As an initial matter, the court is not convinced that the value of the
homes at Barwood are in fact commensurate with the original sale prices charged by
Mr. Sweitzer.  In an effort to prove this point, Mr. Sweitzer presented the expert
testimony of William Rothman, an appraiser who conducted the appraisal of 7
Barwood homes that rendered values consistent with the original sales prices.  (*See*
Defendant Sweitzer's Ex. 9.)  In addition to Mr. Rothman's analysis, Mr. Sweitzer
contends that the original appraisals support the original sale prices because they
were performed "by numerous independent appraisers, selected by the various
lending institutions, over whom Mr. Sweitzer had no control."  (Def. Sweitzer's Post-
Hr'g Mem. at 12.)

Despite some legitimate questions raised by the Government regarding
Mr. Rothman's analysis, the court found his testimony mostly persuasive as to the 7
properties he appraised.  However, the court is not willing to take the broad leap that
Mr. Sweitzer suggests is warranted by these appraisals, namely that because these 7
properties may have accurately reflected actual value, the actual value of all 88
properties in question was accurate.  Such a broad conclusion is not justified in light
of the reality that so many buyers defaulted or were at risk of default in the same
geographic area during the same relatively short time frame.  (*See* Tr. of Oct. 18,
2004 Hr'g at 116 *ll.*1-22.)  Moreover, despite Mr. Sweitzer's assertions to the

contrary, the original appraisals did not accurately reflect the actual value of Barwood homes.  A HUD investigation revealed that the original appraisals contained errors in the square footage and utilized inappropriate comparable properties.  (*Id*. at 73 *ll*.10-22.)  Likewise, MNC representatives examined the original appraisals and found that they relied on comparable properties from within Barwood that were tainted by fabricated gift funds and large seller concessions.  (*Id*. at 125 *ll*.1-19.)  In short, the fact that so many Barwood buyers that were provided false gift letters or unearned sweat equity either defaulted or ran the risk of default prohibits the court from concluding that the value of the homes at Barwood were in line with the original sales prices charged by Mr. Sweitzer.

Even if the court found Mr. Sweitzer's position to be correct, the court would still not credit Mr. Sweitzer the original sales price as the "full value" of the properties in Categories 2 and 3.  In these categories, the loss was offset by the re-sale of the property.  Under these circumstances, the "most reliable" measurement of valuation is generally the amount actually recouped as a result of the re-sale.  For instance, under Application Note 8(b) to U.S. Sentencing Guideline § 2F1.1, the amount of loss is reduced by the amount recovered from assets securing the loan. The Third Circuit's decision in *Napier* supports such a result.  In *Napier*, the Third Circuit reasoned that valuation stemming from arm's length transactions between sophisticated parties is preferable to appraisals, which rely on estimates.  *Napier*, 273 F.3d at 279.  The parties in this case dispute whether the re-sale transactions in Categories 2 and 3 were conducted at "arm's length."  Nevertheless, the court concludes that these re-sale values offer the best measurement of the full value Mr. Sweitzer is entitled to in light of the circumstances.  *See id.* (holding that a district

court's decision to rely on a re-sale value instead of an appraisal value was not clearly erroneous even over the defendant's objection that the sale was not an arm's length transaction between sophisticated parties).

As for the 54 modified loans in Category 1, even though the court rejects Mr. Sweitzer's argument that these loans were improperly modified downward because the original sales prices were accurate, the court is persuaded by Mr. Rothman's testimony that the downward adjustments were based on unreliable appraisals. Once MNC and HUD discovered the fraudulent activity occurring at Barwood, they entered into an agreement in which MNC would, among other things, obtain new appraisals for the 54 loans in Category 1 and buy down the mortgages for the overvalued amounts. MNC retained the services of Wesley Brown to conduct the new appraisals. (Tr. of Oct. 18, 2004 Hr'g at 123 *ll*.2-6.) Mr. Rothman critiqued Mr. Brown's appraisals and found several significant flaws.

First, Mr. Rothman testified that Mr. Brown only used 3 comparables and that generally a higher number of comparables should be utilized for a mass appraisal. (*Id*. at 180 *ll*.1-8.) According to Mr. Rothman, using just 3 comparables for all 54 appraisals undermines the value of the report. (*Id*.) Second, Mr. Rothman testified that 2 out of the 3 comparables selected by Mr. Brown were inadequate because their location and style did not match the homes at Barwood. (*Id*. at 180-87.) These two comparables were located in a different municipality and school district. (*Id*. at 180 *ll*.11-14.) They were located in a more industrial area than Barwood. Further, the Brown comparables were units in a row complex whereas the Barwood homes were all semi-detached, which is only two houses attached by a

common wall.  (*Id*. at 176 *ll*.23-25, 181 *ll*.17-25, 187 *ll*.6-11.)[22]  Mr. Rothman noted

that these inadequate comparables undercut the reliability of Mr. Brown's appraisals

because he did not make the appropriate adjustments for these substantial

differences.  (*Id*. at 187 *ll*.6-11, 188-89.)

The court finds Mr. Rothman's testimony persuasive.  Mr. Brown's

failure to compensate for the obvious differences between the comparables and the

homes at Barwood renders his appraisals unreliable.  Without reliable appraisals, the

court is unable to determine what loss MNC incurred in modifying the 54 loans in

Category 1.  Thus, the court will exclude the amount of the Category 1 loans from

the calculation of loss.[23]

The Government provides little on this particular issue to rebut Mr.

Rothman's criticisms of Mr. Brown's reports.  Most of the Government's arguments

go to the flaws in Mr. Rothman's appraisals.  These arguments, however, apply with

equal force to the deficiencies in Mr. Brown's appraisals, particularly the

Government's contention that Mr. Rothman's "failure to use any Barwood properties

as comparables renders his opinion meaningless."  (Gov't's Resp. to Post-Hr'g

Mem. at 19.)  Mr. Brown's comparables were not located in Barwood and in fact

were located further away from Barwood than all of Mr. Rothman's comparables.

---

[22]Mr. Rothman's testimony describes the flaws in Mr. Brown's appraisals in even greater detail. (*See* Tr. of Oct. 18, 2004 Hr'g at 180-89.)  Mr. Sweitzer also submitted a map and photographs that highlight the shortcomings in Mr. Brown's comparables.  (*See* Def. Sweitzer's Exs. 8 and 10.)

[23]Mr. Sweitzer also intimates that MNC instructed Mr. Brown to provide lower valuations in order to satisfy HUD and avoid being referred to HUD's disciplinary process.  Mr. Sweitzer suggests that this motive renders the objectivity of Mr. Brown's appraisals suspect.  The court does not find any evidence to suggest that Mr. Brown's appraisals were intentionally low to comply with MNC's "scheme."  In fact, both HUD and MNC representatives testified that Mr. Brown was not given any directions as to reaching a particular outcome with the appraisals.  (*See* Tr. of Oct. 18, 2004 Hr'g at 80 *ll*.11-16, 123 *ll*.10-13.)

Regardless, the Government also failed to produce Mr. Brown to defend his work or a new expert to verify that Mr. Brown's appraisals were legitimate valuations.

The only evidence the Government presented to support Mr. Brown's appraisals was that his appraisals were consistent with the re-sale amounts HUD and MNC received in foreclosures and short sales. Although the Government calculates the average difference between the original loan amount and the re-sale amount for 22 of the homes in Category 2, the Government does not demonstrate that the average difference between the original loan amount and the Brown appraisals for the Category 1 loans was similar. (*See id*. at 17-18.) Thus, the court is unable to discern whether the Brown appraisal values are in fact in line with the re-sale amounts. Nevertheless, even if the Government's theory is correct, the court does not believe this evidence would necessarily lend support to Mr. Brown's appraisals. The defects in the appraisals are obvious and call into question the reliability of Mr. Brown's assessments. In short, the Government has failed to prove by a preponderance of the evidence that its calculation of loss for the Category 1 loans is an accurate reflection of the actual loss sustained on those loans. Accordingly, the court will exclude the amount of these loans, $1,334,150.46, from the loss calculation.[24]

## C.   The Reliability of the Government's Calculation of Loss

Mr. Sweitzer argues that the Government failed to offer a reliable calculation of the loss amounts it claims. The Government introduced two main

---

[24]Mr. Sweitzer also argues that the Category 1 loans should be excluded as a matter of law because they constitute potential future losses instead of actual loss. *See United States v. Kopp*, 951 F.2d 521, 536 (3d Cir. 1991). In light of the court's conclusion that the Category 1 loans should be excluded due to the unreliability of the appraisals that set the loss amount, the court need not address this argument. However, the court points out that Application Note 8(b) to U.S. Sentencing Guideline § 2F1.1 contemplates that expected losses may be included in the determination of actual loss.

exhibits to demonstrate its calculation of loss, Government Exhibits 1 and 4. Government Exhibit 1 is a spreadsheet prepared by Special Agent Norwood, the agent who investigated the case for HUD, and Government Exhibit 4 is a spreadsheet prepared by Mr. McGee, the vice-president for asset recovery at MNC. These spreadsheets purport to set forth how the loss figures were derived. Mr. Sweitzer argues, however, that they do not provide enough information to support the Government's analysis of loss. In other words, Mr. Sweitzer contends that the Government's numbers do not add up.

### 1.   Category 1 Loans

As for the Category 1 loans, the court notes that at first blush, the Government's loss figures in its Exhibit 1 are inadequate. However, the Brown appraisal figures listed under the heading of "New Appraisal" in the Government's Exhibit 4 provide the missing part of the equation needed to calculate the bank loss for these loans. Using the figures under "New Appraisal" does not produce the exact number listed as "Bank Loss" in the Government's Exhibit 1, but in most cases, it yields a number that is slightly higher than the alleged bank loss. Thus, the court concludes that the bank loss figures in Government Exhibit 1 are reasonable estimates. In any event, these calculations have already been excluded by the court as explained in the preceding section. *See supra* Part III.B.

### 2.   Category 2 Loans

As for the loans in Category 2, the court notes that there was considerable confusion at the hearing regarding how Special Agent Norwood

calculated these loss figures in Government Exhibit 1.[25]  (*See* Tr. of Oct. 18, 2004 Hr'g at 52-53, 59-67.)  The Government would have the court place great weight on Special Agent Norwood's testimony that the loss is as she says, but the court declines to do so.  Suffice it to say, Special Agent Norwood's testimony was less than convincing.  (*See id.*)

Despite the confusion over how the loss figures for the Category 2 loans were derived, the court accepts the Government's formula that the bank loss is equal to the amount reimbursed to HUD by MNC minus the re-sale of the property plus administrative costs incurred in the re-sale.  (*Id.* at 63-65, 66-67.)  It is impossible to verify Special Agent Norwood's loss amount exactly because the Government does not provide the administrative cost figures.[26]  Nonetheless, the Government's calculation provides a "reasonable estimate" of the fraud-related loss in this case.  U.S. Sentencing Guidelines Manual § 2F1.1, app. n.9.  For instance, for borrower David M. Lambert, the amount reimbursed to HUD was $93,163.06 and the re-sale amount was $66,000.00.  (Gov't Ex. 1 at 5.)  In order to get $35,607.97 for the loss as the Government alleges in its exhibit, the administrative costs would have had to be $8,444.91.  The court concludes that this amount is roughly equivalent to

---

[25]The Government's Exhibit 4 does not provide any greater clarity on this issue.

[26]In fact, Special Agent Norwood testified that she did not know what the administrative fees entailed.  (Tr. of Oct. 18, 2004 Hr'g at 64 *ll.*18-19.)  Nevertheless, the court is satisfied that administrative costs existed.  Special Agent Norwood testified that Mr. McGee sent her information on the administrative costs.  (*Id.* at 64 *ll.*20-25 to 65 *ll.*1-4.)

reasonable administrative costs such as unpaid taxes, the costs of appraisals, and so forth.[27]  Thus, the court accepts the Government's formula.

The problem with the Government's formula, however, is that it can be applied only to Loans 1, 13, 14, 15, 19, and 20.  (*See* Gov't Ex. 1 at 5-6.)  For Loans 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 17, and 18, the amount reimbursed to HUD by MNC is the same as the bank loss.  For Loans 11, 16, 21, 22, and 23, the amount reimbursed to HUD by MNC is either missing or zero.  Inserting the numbers for these two sets of loans into the Government's formula would produce a negative amount of "loss." Inexplicably, the Government offers *no* explanation regarding the method of calculation of loss for these loans.

As for Loans 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 17, and 18, it is intuitive that the bank loss is equal to the amount reimbursed to HUD by MNC.  Thus, the court will accept the loss amounts for these loans.  However, as for Loans 11, 16, 21, 22, and 23, the court simply cannot find a justification for the Government's loss figure. The Government has not met its burden of proof for these loans; therefore, the court will exclude these loans, a total of $215,812.00, from the overall loss calculation.

With respect to Loan 24, the Black property, the Government estimated that MNC's loss would be $54,000 on this loan even though the property has not yet been re-sold.  Mr. Sweitzer does not dispute that this estimate of loss is properly included in the loss calculation.[28]  Rather, Mr. Sweitzer challenges Special Agent

---

[27]The highest amount of administrative costs was $14,755.65.  (Gov't Ex. 1 at 6, The Ronald & Tina Ort Transaction.)  Nevertheless, the average amount was $7,792.58, and this appears to be a reasonable estimation of administrative costs.

[28]Nor could he.  Application Note 8(b) to U.S. Sentencing Guideline § 2F1.1 provides that

(continued...)

Norwood's methodology for calculating the estimated loss for this property.  Special Agent Norwood testified that she determined the estimated loss by finding a property with a similar sales price that had already been re-sold and applying the loss for that property to the property that had not yet been re-sold.  (Tr. of Oct. 18, 2004 Hr'g at 54 *ll*.16-23.)  Mr. Sweitzer asserts that Special Agent Norwood inappropriately assumed the properties were comparable and did not examine factors that would affect the foreclosure sales price such as condition of the property.  The court does not feel that a detailed analysis is warranted.  Because Special Agent Norwood provided a reasonable basis for calculating the expected loss of Loan 24, the court will accept her estimation.

### 3.    Category 3 Loans

The court's analysis regarding the Government's calculation of loss for the 10 loans in Category 3 is driven by the court's conclusions in the preceding section.  *See supra* Part III.C.2.  Loans 1, 4, and 8 fall under the Government's formula that the loss equals the amount of the claim by HUD minus the re-sale amount plus administrative costs.  Thus, the court will include these loans in the calculation of loss.  Under Loan 2, the amount of the claim paid by HUD equals HUD's loss.  The court will also include this loan in the loss calculation.  Loans 3, 9, and 10 reflect estimated HUD losses because the properties have not yet re-sold.  As explained above, the court accepted Special Agent Norwood's method for estimating loss; therefore, the court concludes that these loans are properly included in the loss formulation.  As for Loans 5, 6, and 7, the Government failed to include the re-sale

---

[28](...continued)
expected losses may be included in the calculation of actual loss.

amount of the property.  Short of blindly accepting the Government's alleged loss, the court cannot discern a rational basis for how this loss was calculated.  Therefore, the court will exclude the amount of these loans, $184,196.00, from the loss.

In sum, the court concludes that the Government's calculation of loss was not a model of clarity.  Even though the Category 1 loans appear to have some support in the Government's spreadsheets, these loans are already excluded as outlined above.  *See supra* Part III.B.  The court was able to piece together some logical basis for including most of the loans in Categories 2 and 3.  The court, however, was unable to find any justification for the loss amounts in Loans 11, 16, 21, 22, and 23 under Category 2 ($215,812) and Loans 5, 6, and 7 under Category 3 ($184,196).  Thus, the total of these loans, $400,008, will be deducted from Mr. Sweitzer's fraud-related loss.

### D.     The Appropriateness of Including MNC's Loss

Mr. Sweitzer asserts that the loss determination in this case should be limited to HUD's unrecouped losses and should exclude MNC's claimed losses. Essentially, Mr. Sweitzer contends that it would be unfair to attribute MNC's loss to him for sentencing purposes.  Mr. Sweitzer paints MNC as a "de facto" co-conspirator given that one of its representatives, Defendant Fierro, and allegedly other unnamed high-ranking MNC executives were involved in the wrongdoing. Additionally, Mr. Sweitzer points out that HUD has been made whole on all of its MNC-financed transactions by virtue of the settlement agreement between MNC and HUD and argues that the issue of whether Mr. Sweitzer and the other defendants are responsible for MNC losses should be reserved for adjudication in a related civil

lawsuit that is currently pending before another judge in the Middle District of
Pennsylvania.

The Government rebuts Mr. Sweitzer's arguments by citing to *United
States v. Mummert*, 34 F.3d 201 (3d Cir. 1994).  In *Mummert*, the Third Circuit
concluded that

> [a] defendant in a fraud case should not be able to reduce
> the amount of loss for sentencing purposes by offering to
> make restitution after being caught. . . .  The same rule
> applies when the offer of restitution is made by a third party
> who was involved in the offense . . . .

*Id*. at 204.  The court agrees that *Mummert* disposes of Mr. Sweitzer's argument.
The court's primary task in calculating actual loss is "to determine the harm *caused*
by the defendant's crime."  *United States v. Feldman*, 338 F.3d 212, 220 (3d Cir.
2003).  That HUD was made whole through its settlement agreement with MNC does
not lessen the fact that Mr. Sweitzer's crime caused a loss.  The Third Circuit's
opinion in *Mummert* instructs that transferring the loss to a third party does not alter
the calculation.  *Mummert*, 34 F.3d at 204.  Further, the court rejects Mr. Sweitzer's
suggestion that MNC's loss should be excluded from the sentencing inquiry and left
for determination in a civil proceeding.  Under *Mummert*, MNC's alleged loss is
entirely relevant to Mr. Sweitzer's sentencing formulation, especially in light of the
court's belief that Mr. Sweitzer's conduct set into motion the events that led to the
settlement agreement.  Mr. Sweitzer loses sight of the fact that but for the settlement
agreement, the losses would have been incurred by HUD.

The court also rejects Mr. Sweitzer's argument that MNC's claimed
losses should be excluded because MNC is akin to a co-conspirator.  The *Mummert*
court specified that its ruling applied even when the third party was "involved in the

offense." *Id*.  Additionally, the Government points out that "nothing in the Guidelines or in the caselaw interpreting them precludes a finding that an individual or entity was both a victim and a participant." *United States v. Badaracco*, 954 F.2d 928, 934 (3d Cir. 1992) (discussing the defendant's sentencing enhancement for role in the offense).  In large corporations such as MNC, it is quite possible that "the left hand may not know what the right hand is doing."  In such situations, the wrongdoers must be separated from the victims.  In short, the court will not exclude MNC's claimed losses from Mr. Sweitzer's loss calculation.

### E.   Gain as a Proper Measurement of Loss

Finally, Mr. Sweitzer asserts that the most appropriate measurement of his wrongdoing in this case is the improper gain he realized in avoiding the grant company fees.  Mr. Sweitzer contends that the essence of his crime is that he falsely reported gift funds and earned sweat equity in order to circumvent grant company fees.  Thus, Mr. Sweitzer offers that his improper gain would most accurately reflect his misconduct, especially in light of what he alleges is a speculative calculation of loss compiled by the Government.  The court disagrees.

The court concludes that Mr. Sweitzer's improper gain would grossly underestimate the harm caused by his actions.  A defendant's gain "may be used only when it is not feasible to estimate the victim's loss and where there is some logical relationship between the victim's loss and the defendant's gain so that the latter can reasonably serve as a surrogate for the former." *United States v. Dickler*, 64 F.3d 818, 826 (3d Cir. 1995).  In the captioned matter, the court has been able to compute a reasonable estimate of the victim's loss.  Further, Mr. Sweitzer's gain, which he calculates to be $61,965, pales in comparison to the more than one million

dollars the court has found to be the Government's loss.  For these reasons, the court rejects Mr. Sweitzer's argument advocating improper gain as an alternative to the loss calculation.

### F.      Defendant Fierro's Arguments

Mr. Fierro joins Mr. Sweitzer's arguments regarding valuation, a finding of zero loss, and the exclusion of MNC's claimed losses.  Mr. Fierro, however, also asserts that the Government's loss cannot be attributed to him because he had a very limited role in the conspiracy.  Mr. Fierro was a loan officer at MNC who took loan applications for Barwood properties.  (Fierro Aff. ¶ 2.)  He was aware that the loans were procured through false gift letters or unearned sweat equity, but encouraged Mr. Sweitzer to utilize gift companies.  (*Id*. ¶¶ 5, 9.)  Mr. Fierro only met with buyers after the details of the sales agreement had been negotiated.  (*Id*. ¶ 4.)  Mr. Fierro alleges that he had no role in selecting the appraiser and had no reason to believe that buyers failed to receive full value.  (*Id*. ¶¶ 7, 9.)

To the extent Mr. Fierro is arguing that the calculation of loss be reduced as it pertains to him because he had a limited role in the conspiracy, the court disagrees.  The small role Mr. Fierro allegedly played in the conspiracy does not impact on loss calculation.  Further, in a conspiracy, a defendant may be held responsible for criminal conduct committed in furtherance of the conspiracy by another member of the conspiracy.  U.S. Sentencing Guidelines Manual § 1B1.3(a)(2) (2000).  For similar reasons, Mr. Fierro's argument that the alleged inflated valuations are unattributable to him because he did not participate in pricing or obtaining appraisals must fail.  Mr. Fierro admits that he knew the loans were completed with false reports of gifts and earned sweat equity and had to have known that buyers who

had obtained inappropriate settlement assistance were at greater risk of default. Regardless, even if Mr. Fierro truly believed the valuations were proper, he would still be held responsible for the actions of his co-conspirators.  Thus, the court concludes that Mr. Fierro is not entitled to a reduction in the calculation of loss as it pertains to him because of his alleged limited involvement in the misconduct.

Mr. Fierro also argues that the gain he realized in handling the loans in question is a better reflection of his culpability.  Mr. Fierro received approximately $19,200 in commissions, and he argues that this amount is a better measure of his fraud-related conduct.  As stated above, the court was able to calculate a reasonable estimate of the loss in this case.  *See supra* Part III.E.  This determination applies with equal weight to Mr. Fierro and is the true loss caused by Mr. Fierro and the conspiracy in which he participated.  The amount of his wrongfully obtained commissions would vastly underestimate this loss.  Therefore, the court will not consider Mr. Fierro's improper gain as an alternative to the loss.

## IV.        <u>Conclusion</u>

In accordance with the foregoing discussion, the court concludes that the amount of fraud-related loss caused by Mr. Sweitzer is $1,415,220.  The Government's alleged amount of loss was $3,149,378.  However, this court excluded the total amount of the loans in Category 1, $1,334,150, because those figures were based on unreliable appraisals.  Additionally, the court concludes that Loans 11, 16, 21, 22, and 23 in Category 2, totaling $215,812, were properly excluded because the Government's calculations were unreliable.  Similarly, the court found that Loans 5, 6, and 7 in Category 3, totaling $184,196, were properly excluded because of the

Government's unreliable calculation.  Therefore, the court finds that the Government only met its burden of proving $1,415,220 in loss with respect to Mr. Sweitzer.[29] This calculation also applies to Defendants Hoch and Sedor because they are similarly situated to Mr. Sweitzer.  Mr. Fierro, however, was only involved in the MNC-related transactions and therefore is not responsible for the non-MNC loans. The amount of loss attributable to him is $1,008,975.[30]


                                         __s/Sylvia H. Rambo_____
                                         SYLVIA H. RAMBO
                                         United States District Judge

Dated:  April 22, 2005.

---

[29]The break down of this calculation is as follows:

| | |
|---|---|
| Government's initial figure: | $3,149,378 |
| Category 1 Exclusion: | ($1,334,150) |
| Category 2 Exclusions: | ($215,812) |
| Category 3 Exclusions: | ($184,196) |
| Total Loss: | $1,415,220 |

[30]The break down of this calculation is as follows:

| | |
|---|---|
| Government's initial figure: | $3,149,378 |
| Category 1 Exclusion: | ($1,334,150) |
| Category 2 Exclusions: | ($215,812) |
| Category 3 Exclusions: | ($590,441) |
| Total Loss: | $1,008,975 |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA**   :   CASE NOS.  **1:CR-03-087-01**
                               :              **1:CR-03-087-02**
                               :              **1:CR-03-087-03**
            **v.**             :              **1:CR-03-087-04**
                               :
**GARY L. SWEITZER**           :
**LOUIS FIERRO**               :
**BRIAN HOCH**                 :
**MICHAEL SEDOR**              :

## O R D E R

In accordance with the accompanying memorandum of law, **IT IS**

**HEREBY ORDERED THAT**:

1) Defendant Sweitzer's objections to the Government's calculation of

fraud-related loss is **GRANTED in part** and **DENIED in part** as follows:

a) Defendant Sweitzer's objections are **GRANTED** with respect

to the 54 in loans in Category 1, Loans 11, 16, 21, 22, and 23 in Category 2, and

Loans 5, 6, and 7 in Category 3.

b) Defendant Sweitzer's objections are **DENIED** in all other

respects.

2) The amount of loss attributed to Defendants Sweitzer, Hoch, and

Sedor is $1,415,220.

3) The amount of loss attributable to Defendant Fierro is $1,008,975.

       4) The probation officer in this case shall calculate a revised presentence report with these figures.  A date for sentencing will be established upon the court's receipt of the revised presentence report.


                                             s/Sylvia H. Rambo
                                           SYLVIA H. RAMBO
                                           United States District Judge

Dated:  April 22, 2005.